# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 9, 2009

## STATE OF TENNESSEE v. ANTONIO VAUGHN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-D-2752     Cheryl A. Blackburn, Judge**

_____

**No. M2008-01067-CCA-R3-CD - Filed April 13, 2010**

_____

A Davidson County jury found the defendant, Antonio Vaughn, guilty of possession of not less than one-half ounce nor more than ten pounds of marijuana with intent to sell or deliver within one thousand feet of a school, a class D felony.  The trial court sentenced him, as a Range III career offender, to serve 12 years, at 100 percent, in the Tennessee Department of Correction.  On appeal, he challenges the sufficiency of the convicting evidence and the denial of his motion for a mistrial.  After reviewing the parties' briefs, the record, and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Wendy S. Tucker (on appeal) and Jeremy Parham (at trial), Nashville, Tennessee, for the appellant, Antonio D. Vaughn.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Bret Thomas Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

On October 23, 2006, the Davidson County Grand Jury indicted the defendant, Antonio Vaughn, for possession of not less than one-half ounce nor more than ten pounds

of marijuana with intent to sell or deliver within one thousand feet of a school. The state presented the following evidence at trial.

David Kline testified that he worked in the mapping division of the Metro Planning Department. His office makes topographical, planning, transportation, and cadastral maps for the assessor's office. His office also makes maps for the public and state and local government offices. The prosecution requested that Mr. Kline make a map that "centered on McKissack School at 915 38th Avenue North[.]" The map was an "aerial photo, and overlaid on top of it [was] property lines." At the prosecution's request, Mr. Kline put a buffer on the map. The map showed the property line of the McKissack School, and it also had a line that was 1,000 feet away from the school's property line.

Metro Nashville Police Officer Jamell Randall testified that he had been a police officer for twelve years. He was a field training officer at the East Precinct and was responsible for "enforc[ing] all laws and regulation and traffic, drug enforcement, domestic violence, [taking] all reports, and also train[ing] individual officers that recently just graduated from the academy." In September 2005, Officer Randall was training officers at the North Precinct. Officer Randall stated that he encountered Antonio[1] around 8:20 p.m. on September 28, 2005. According to Officer Randall, it was not dark, and he and Officer Xay Phasavath were using a laser to enforce traffic around the "Clifton block area." The officers had parked their car and were on foot "lasering [sic]" traffic traveling outbound on Clifton Avenue. Officer Randall was operating the laser, and he measured the speed of the car in which Antonio was a passenger and found that the vehicle was traveling forty-six miles per hour in a thirty miles per hour zone. Officer Randall said that after he "flagged the car over" the driver "recognized [them], started to slow down, and [the car] got . . . about twenty-five feet in front of [the officers]." Officer Randall testified that he saw the driver of the vehicle, Chance Vaughn, "moving his hands like he was stuffing something in the front of his pants." Officer Randall approached the vehicle, informed the driver of his offense, and asked him for his driver's license. The driver was only able to produce a Tennessee identification card, so Officer Randall asked him to exit the vehicle.

After Chance exited the vehicle, Officer Randall observed "a big bulge in the front of his pants[.]" Officer Randall asked Chance about the bulge, and he responded that it was marijuana. Chance removed the marijuana from his pants and gave it to Officer Randall. After advising Chance of his *Miranda* rights, Officer Randall questioned him about the marijuana. According to Officer Randall, Antonio was present while he questioned Chance

_____

[1] Because both men involved in this case (Antonio Vaughn and Chance Vaughn) have the same last name, we will refer to them by their first names in order to avoid confusion. No disrespect is intended to any person described or discussed herein.

and acknowledged hearing what Chance told Officer Randall about the marijuana. Officer Randall said that he and Chance were "in front of the vehicle[,] [a]nd [Antonio] was still inside on the passenger's side." Officer Randall testified that Chance "stated that [he and Antonio] were cousins. [Antonio] came to him with the marijuana. [Chance] stated that they agreed that [Chance] would help sell it, but [Antonio] was the owner of it."

After Officer Randall spoke with Chance, he advised Antonio of his *Miranda* rights and talked to him about the marijuana. Officer Randall told Antonio that Chance said that the marijuana belonged to Antonio. Officer Randall testified that initially Antonio denied that the marijuana was his, but he later admitted that it was his marijuana and that Chance had told Officer Randall the truth. According to Officer Randall, Antonio told him that Chance "had known somebody who wanted to buy the marijuana. And he kind of did the deal in between . . . [Chance] and the third person who wanted to buy it. And they [were] in route to make that transaction."

Officer Randall testified that Antonio also asked him "several times" not to arrest Chance; however, Officer Randall arrested both men. He did not find any additional drugs or drug paraphernalia when he searched the men. Officer Randall found $938 in cash on Chance, $367 in cash on Antonio, and a cellular phone. Officer Randall seized the marijuana and money, and he turned them in to the property room at the Metro Nashville Police Department. Using the map that Mr. Kline made, Officer Randall identified where the incident occurred.

On cross-examination, Officer Randall testified that he was "about 700 feet" away from the car when he could first see inside of it. He further testified that he was standing on the side of the street, and the car was traveling down a gradual grade toward him. Officer Phasavath was standing near the curb "approximately eight feet" to the left of Officer Randall. Officer Randall recalled that it was beginning to get dark when they saw the car, but he could not recall whether the car had on its headlights. Officer Randall testified that the car was around fifteen yards away when he saw Chance moving like he was stuffing something in his pants. Officer Randall stated that "[m]aybe thirty seconds" passed between the time that he clocked the car's speed and when Officer Phasavath flagged the car over and the car stopped. Officer Randall could not hear the conversation between the occupants of the vehicle. He stated that "because of [Chance's] movement and the safety issues[,] . . . [h]e was more focused on [Chance] than [Antonio]." Officer Randall testified that he had no reason to believe that Antonio directed Chance to put anything in his pants.

When Officer Randall approached the vehicle, the movement inside the vehicle had stopped. Officer Randall could see inside the vehicle, and he did not see any marijuana. Officer Randall agreed that he did not see Antonio do anything that would justify taking him

into custody. When Officer Randall asked Chance what was in his pants, Chance pulled the marijuana from "right where his private area would be." After Officer Randall mirandized Chance, Chance told him that the marijuana was Antonio's. Officer Randall agreed that, in his experience, this was not the first time that one person tried to blame another when drugs were found in a stopped vehicle. Officer Randall explained that

> [i]f [he stops] a car and somehow the driver or the passenger . . . get[s] out with marijuana on the person, they usually claim it. Now, maybe if it was in a place where both of them can get to it, like in the center of an ashtray or something like that, and we've got multiple subjects in the vehicle, then maybe, yeah. . . . But usually if it's on that person, that person usually claim[s] it.

Officer Randall stated, "[Chance's] words were, I was helping [Antonio] sell it. It's [Antonio's], and I just have possession of it."

Officer Randall testified that when investigating he tries "to hear all sides of the story and go with the facts . . . . Every situation and every statement that somebody tells the police is different. [He looks] at it on a case by case basis." Officer Randall stated that before arresting Antonio he spoke with both men, and based on what they told him, he established probable cause to arrest them. Officer Randall read the men their *Miranda* rights; however, he did not have them execute written waivers of their rights. Officer Randall said that because he was talking loudly, Officer Phasavath heard his conversation with Antonio.

Officer Randall testified that during their conversation, Antonio initially denied the drugs were his; however,

> maybe five minutes into talking to [Antonio] about the narcotics and also talking to [Chance], calling somebody to come pick up their vehicle because [Officer Randall] didn't want to tow it, [Antonio] changed his story and said that the drugs was [sic] his and, in fact, [Chance's] story was true.

Officer Randall stated that he did not threaten or coerce Antonio to make him say that the drugs were his. When asked whether Antonio explained why he decided to claim the marijuana, Officer Randall answered, "I think I can recall [Antonio] being real concerned about his past criminal history."

Defense counsel contemporaneously objected, and the trial judge instructed the jury to disregard Officer Randall's answer. The parties had a bench conference. After the bench conference, defense counsel resumed cross-examination of Officer Randall.

-4-

Officer Randall testified that after he questioned Antonio, two women arrived to retrieve the vehicle that Chance was driving. Officer Randall did not give the state the women's names, but he said that their names were likely on the tow report form, which released the police department of liability for the vehicle. Officer Randall said that when the women came, they talked to Antonio about what was going on, and Antonio admitted to them that the drugs were his. Antonio also told them why he was changing his mind about owning the drugs. Officer Randall stated that he would have arrested Antonio even if he had not admitted to owning the drugs because of the "particular facts that [he] had in the case."

After Officer Randall arrested the men, he searched the vehicle and did not find any scales, containers to divide the marijuana, or any more drugs. He also searched Antonio's person and did not find anything illegal. He stated that someone could have purchased the bag of marijuana that he recovered from Chance for individual use. Officer Randall stated that he did not see either Antonio or Chance sell or attempt to sell marijuana.

Officer Randall was responsible for taking Antonio downtown for booking. He stated that the police station had rooms with audio and video recording capabilities available, but he did not use such a room when booking Antonio. According to Officer Randall, "street level officers conduct their business on the street" and do not use interview rooms. Officer Randall agreed that the stop had gone beyond a traffic citation; however, he stated that this stop was still "street level." Officer Randall said that the "whole ordeal took four hours from beginning to end." Of those four hours, two to three were spent at the scene of the stop, and the booking process took about an hour and a half. Officer Randall questioned the men for about fifteen minutes while at the scene of the stop.

Officer Xay Phasavath testified that on September 28, 2005, he was working at the Metro Nashville Police Department with Officer Randall, his training officer. On that day, they were conducting radar enforcement at 39th Avenue North and Clifton Avenue when they stopped the car that Chance was driving. Officer Phasavath observed Officer Randall recover "a large plastic bag with what appear[ed] to be a green leaf substance inside," which Chance had stuffed inside the crotch area of his pants. Officer Phasavath heard Officer Randall speaking to Antonio, and he testified that Antonio initially denied that the marijuana was his. According to Officer Phasavath, after Chance said that he could prove the marijuana belonged to Antonio, Antonio changed his mind, claimed the marijuana, and said that Chance was selling the marijuana for him.

On cross-examination, Officer Phasavath testified that when he flagged the vehicle down, the driver appeared to be stuffing something inside his pants. However, Officer Phasavath did not actually see Chance stuffing anything inside his pants. When the vehicle

stopped, Officer Phasavath stood on the passenger side of the vehicle. After Chance exited the vehicle, Officer Phasavath could see the bulge in his pants because Chance walked back toward the vehicle. Officer Phasavath stated that he could not hear any conversation between Antonio and Chance when he flagged down the vehicle and the car was stopping. He further stated that Chance was the only person moving inside the vehicle. Officer Phasavath did not see Antonio make any movements while the car was stopping, and he did not hear Antonio tell Chance to hide the marijuana.

Officer Phasavath heard Officer Randall mirandize Chance, but he did not hear the details of their conversation. Officer Phasavath watched Chance, who was sitting on the sidewalk behind the vehicle, while Officer Randall talked to Antonio. Officer Phasavath heard their conversation but did not make any notes of it. However, Officer Phasavath stated that he completed a police report. Officer Phasavath was present when Officer Randall searched Antonio, and he agreed that Antonio did not possess any illegal items. He also agreed that nothing illegal was found in the vehicle.

Brett Trotter, a forensic scientist in the drug section of the Tennessee Bureau of Investigation Nashville Crime Laboratory, testified that the police department gave him material related to this case. He examined the material and determined that the substance was marijuana. He stated that in Tennessee, marijuana is a Schedule VI controlled substance. Agent Trotter stated that the marijuana weighed 108.9 grams, which was 3.8 ounces.

Metro Nashville Police Department Patrol Unit Lieutenant, William Mackall, testified that based on his experience and training, the street value of the marijuana confiscated in this case would be around $350. He stated that illegal drug use and cash "go hand in hand." He further stated that narcotic sales are a "cash business" and that buyers "very seldom" purchased drugs on credit. According to Lieutenant Mackall, people who strictly use marijuana typically have a few grams of marijuana and rolling papers or a marijuana pipe in their possession. He said drug buyers use rolling papers and marijuana pipes to smoke marijuana, and those that are "purely users" usually have such paraphernalia. Lieutenant Mackall testified that the amount of marijuana seized in this case was an amount that sellers usually sell to an individual solely for their use.

On cross-examination, Lieutenant Mackall testified that he was not personally involved in the investigation of this case, and he was testifying based on his experience. He stated that based on his experience, buyers purchase street level marijuana in grams. He further stated that sometimes the seller will have a scale on their person and other times the drugs are "preweighed" and "prepackaged." He went on to explain that

a small level dealer [would] break it down into grams or half a gram[]. If you're a mid level, you may be selling it in this [case's] quantity or you could be selling it as a pound, so forth and so on. It just depends on what level dealer you are.

Lieutenant Mackall said that if someone were found with the quantity of marijuana seized in this case, "[t]hey could have purchased it to sell it. [He had] never seen anybody purchase [that] amount of drugs just to use for . . . personal use." He testified that marijuana smokers typically use a gram of marijuana per "joint," and in this case, the marijuana would yield twenty-eight "joints." He agreed that there were no scales, baggies, or envelopes found on Antonio, Chance, or in the vehicle. He further agreed that if the men were going to sell the marijuana they would have had to go somewhere to weigh and package it.

On redirect examination, Lieutenant Mackall agreed that, hypothetically, it was typical for a person to "have a quantity of marijuana in their home, receive an order for four ounces of marijuana, measure it out, package it, put [it] in their car, and take it to the person who ordered it." On recross-examination, Lieutenant Mackall testified that normally if one is purchasing marijuana for resale, they buy a larger quantity and then break it down and sell it. He further testified that if someone was purchasing marijuana for themselves only, they would buy a half gram or gram.

At the close of the state's proof, defense counsel made a motion for judgment of acquittal, which the trial court denied. In the alternative, the defense counsel made a motion for a mistrial based on Officer Randall's mention of Antonio's prior criminal record. The trial court also denied Antonio's motion for a mistrial. Antonio waived his right to testify, and the defense did not present any proof. The jury found Antonio guilty of possession with intent to sell or deliver more than half an ounce but less than ten pounds within one thousand feet of a school, a class D felony. The court sentenced Antonio, as a Range III career offender, to serve 12 years in the Tennessee Department of Correction at 100 percent. The defendant appeals his conviction.

**Analysis**

On appeal, Antonio argues that the evidence was insufficient to support his conviction, and the trial court committed error when it denied his motion for a mistrial. The state contends that the evidence was sufficient to convict Antonio, and the trial court did not abuse its discretion when it declined to declare a mistrial.

1. Sufficiency of Evidence

It is well established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans,* 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given to the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). However, the circumstantial evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 613.

The jury found Antonio guilty of possession with intent to sell or deliver more than one-half an ounce but less than ten pounds of marijuana within one thousand feet of a school. In order to convict Antonio the state had to prove that Antonio knowingly possessed, within one thousand feet of a school, not less than one-half ounce nor more than ten pounds of the controlled substance with intent to deliver or sell the controlled substance. Tenn Code Ann. § 39-17-417(a)(4); 39-17-432 (2006).

"'[P]ossession' may be either actual or constructive" and may be proven by circumstantial evidence. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (citing *State v. Patterson*, 966 S.W.2d 435, 444-45 (Tenn. Crim. App.1997); *State v. Brown*, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995)). *See also State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). Constructive possession requires proof that a person had the power and intention at a given time to exercise dominion and control over the drugs either directly or through others. *Shaw*, 37 S.W.3d at 903 (citing *State v. Patterson*, 966 S.W.2d 435, 444 (Tenn. Crim. App. 1997)). In essence, "constructive possession is the ability to reduce an object to actual possession." *State v. Ross*, 49 S.W.3d 833, 845-46 (Tenn. 2001) (citations omitted). However, the mere presence in an area where drugs are discovered, or the mere association with a person who is in possession of drugs, is not, alone, sufficient to support a finding of constructive possession. *Shaw*, 37 S.W.3d at 903 (citing *Patterson*, 966 S.W.2d at 445).

The intention to sell or deliver drugs may be inferred from the amount of the drug possessed by the accused along with other relevant facts surrounding the arrest. *See* Tenn. Code Ann. § 39-17-419; *see also State v. John Fitzgerald Belew*, W2004-01456-CCA-R3-CD, 2005 WL 885106, at *5 (Tenn. Crim. App., at Jackson, Apr. 18, 2005) (noting that the jury can infer intent to sell or deliver when amount of controlled substance and other relevant facts surrounding arrest are considered together). The amount the drugs and the manner in which it was packaged may also support an inference of intent to sell. *See State v. Brown*, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995).

Taken in the light most favorable to the state, we conclude that the evidence was sufficient to establish Antonio's guilt beyond a reasonable doubt. The evidence showed that Officers Randall and Phasavath stopped the car in which Antonio was a passenger. The stop occurred in the area of 39th Avenue North and Clifton Avenue, which is within one thousand feet of McKissack School. Officer Randall seized a bag of a green leaf substance, which was later determined to be marijuana, from the physical possession of Chance. Although Antonio did not have physical possession, the evidence showed that it was Antonio's marijuana, and Chance was going to help him sell it. Both Antonio and Chance told Officer Randall that the marijuana belonged to Antonio and not Chance. Antonio was in constructive possession of the marijuana and had the power and intention to exercise dominion and control over the marijuana. *See Shaw*, 37 S.W.3d at 903 (citing *Patterson*, 966 S.W.2d at 444). Furthermore, Lieutenant Mackall testified that the amount of marijuana seized in this case was not an amount that sellers usually sell to an individual solely for their use. Antonio contends that the testimony of the officers is "disturbingly inconsistent" and this court should disregard it; however, this court does not resolve credibility of the witnesses or conflicts in trial testimony. *See Bland*, 958 S.W.2d at 659. By convicting Antonio, the jury clearly resolved any conflict in the testimony in favor of the state. Accordingly, we concluded that the evidence was sufficient for the jury to convict Antonio, and he is not entitled to relief for this issue.

## 2. Mistrial

Next, Antonio argues that the trial court abused its discretion when denying his motion for a mistrial after Officer Randall testified regarding the "excluded, irrelevant, prejudicial, and inflammatory information regarding [Antonio's] prior criminal history." Antonio contends that Officer Randall's statement violated Rule 404 of the Tennessee Rules of Evidence and the trial court's order excluding evidence of Antonio's previous criminal history.

During cross-examination, defense counsel asked Officer Randall if Antonio told him why he changed his mind about claiming the drugs. Officer Randall answered that Antonio may have been "real concerned about his past criminal history." Defense counsel objected to Officer Randall's answer and requested that the court strike it. The trial court sustained the objection, instructed the jury to disregard the answer, and explained that it was irrelevant to their determination. After the state closed its proof, defense counsel moved the court to declare a mistrial arguing that Officer Randall's response was improper. The court denied the motion and stated that the answer was responsive. In denying the motion, the court noted that Officer Randall's response "was an answer that [defense counsel] didn't like" and that he had given the jury a curative instruction.

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. *See id.*; *State v. Jones*, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting *Arnold,* 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Land*, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. *Id.* When determining whether a mistrial is necessary because inappropriate testimony was presented to the jury, this court considers the following non-exclusive factors: "(1) whether the state elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the relative strength or weakness of the state's proof." *State v. Lawrence Taylor*, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *4 (Tenn. Crim. App., at Jackson, Feb. 14, 2003).

Antonio argues that Officer Randall's statement "was irrelevant and . . . so prejudicial and inflammatory that the jury was unable to render an impartial verdict once it was uttered."

Antonio further asserts that Officer Randall, a "seasoned police officer with twelve years of experience[,]" knew that his answer was improper and prejudicial. The state responds by arguing that Officer Randall's statement did not create a manifest necessity for a mistrial. We agree with the state.

We see no abuse of discretion in the denial of the motion for a mistrial. Officer Randall's answer, which included mention of Antonio's prior criminal history, was improper; however, we do not agree that the comment created a "manifest necessity" for a mistrial. First, there is no implication that the prosecutor deliberately elicited the comment to create an inference of guilt on the part of Antonio. *See Honeycutt v. State*, 544 S.W.2d 912, 917-18 (Tenn. Crim. App. 1976). Officer Randall's answer was responsive to a question that defense counsel himself solicited. Second, the trial court gave a curative instruction immediately after defense counsel objected to Officer Randall's answer. The jury is presumed to have followed the court's curative instruction. *State v. Smith* 893 S.W.2d 908, 923 (Tenn. 1994) (citing *State v. Baker*, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987)). Finally, the state's case against Antonio was strong and suggested that the jury would have been compelled to convict Antonio in the absence of the improper comment. The proof at trial showed that Antonio admitted that he owned the marijuana and gave it to Chance so that he could help Antonio sell it. The amount of marijuana seized created an inference that the men intended to sell it. In addition, the officers stopped the men within one thousand feet of a school. Accordingly, we conclude that the trial court did not abuse its discretion in denying Antonio's request for a mistrial. This issue is without merit, and Antonio is without relief as to this issue.

## Conclusion

Based upon the foregoing review, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE